2006-NMSC-027

144 P.3d 87

Edwina MANNING and Kimberly Dutton, Personal Representatives of the Estate of Richard Manning, individually, and as community property owners, and d/b/a Challenge Mining Company, Plaintiffs–Petitioners,

v.

MINING AND MINERALS DIVISION OF THE ENERGY, MINERALS, AND NATURAL RESOURCES DEPARTMENT of the State of New Mexico and New Mexico Environment Department, Defendants–Respondents.

No. 28,500.

Supreme Court of New Mexico.

June 1, 2006.

Corrected June 29, 2006.

Domenici Law Firm, P.C., Pete V. Domenici, Jr., Lorraine Hollingsworth, Albuquerque, NM, for Petitioners.

Gallagher & Kennedy, P.A., Anthony J. Trujillo, Santa Fe, NM, Walz & Associates, Jerry A. Walz, Cedar Crest, NM, for Respondents.

Robert M. Fiser, Albuquerque, NM, J. David Breemer, James S. Burling, Sacramento, CA, for Amicus Curiae Pacific Legal Foundation.

## OPINION

BOSSON, Chief Justice.

{1} Plaintiffs, owners of a mining property in southwestern New Mexico, claim their land interest has been effectively "taken" from them through application of state mining regulations without the payment of just compensation. They also argue that the State has impaired their contractual obligations in violation of the Contracts Clause. The Court of Appeals held that Plaintiffs' compensatory claims against two state regulatory agencies are barred by state constitutional sovereign immunity. We granted certiorari to address an issue of first impression: whether state constitutional sovereign immunity bars the rights and remedies found in the Takings Clause and the Contracts Clause of the United States Constitution when those rights and remedies are asserted against a state agency. Concluding that such claims are barred under the Contracts Clause, but not the Takings Clause, we affirm in part,

reverse in part, and remand for further proceedings.

## BACKGROUND

{2} Plaintiffs, the Manning family,[1] own land in southwestern New Mexico which was used for mining, milling and smelting operations. The mine operated between 1979 and 1985, and then was shut down. In 1992, the Mannings began to prepare the mine to reopen.

{3} Then, in 1993, prior to the mine being reopened, the State passed the New Mexico Mining Act (the "Mining Act"). NMSA 1978, §§ 69–36–1 to –20 (1993, as amended through 2001). The Mining Act increases mining regulation to "promot[e] responsible utilization and reclamation of lands affected by exploration, mining or the extraction of minerals." Section 69–36–2. The New Mexico Mining and Minerals Division of the Energy, Minerals, and Natural Resources Department and the New Mexico Environment Department (the "State agencies") are the agencies responsible for enforcing the Mining Act. *See* § 69–36–14.

{4} The Mannings have a long, litigious history regarding the application of the Mining Act to their property. In this lawsuit the Mannings claim they cannot determine the bonding and reclamation requirements for the mine unless they are allowed to operate, and yet state regulations will not allow them to operate without first meeting reclamation requirements. Thus, the Mannings argue that the State agencies have effectively taken their property, making it impossible to mine, without justly compensating them. They also argue that these uncertainties, and the additional expenses required under the Mining Act, have prevented them from meeting their contractual obligations and entering into new contracts. The Mannings request compensation for their loss in the amount of $6,500,000.00, plus interest.

{5} In the district court the State agencies moved for summary judgment based on both ripeness and constitutional sovereign immunity. Without addressing immunity, the district court granted summary judgment on

---

1. Richard Manning, who originally brought this action, has since passed away and Kimberly Dutton has been substituted as personal representative of the Estate of Richard Manning.

the basis of ripeness, concluding that the Mannings' difficulties in operating the mine were due to other legal issues that pre-dated the state regulatory scheme. The Court of Appeals affirmed, but based its holding solely on sovereign immunity. *Manning v. Mining & Minerals Div. of the Energy, Minerals, & Natural Res. Dep't,* 2004–NMCA–052, ¶ 1, 135 N.M. 487, 90 P.3d 506. We granted certiorari to analyze the sole question of whether constitutional sovereign immunity bars the Mannings' Takings and Contracts Clause claims. We do not address whether the Mining Act, as applied to the Mannings, constitutes a regulatory taking, nor do we address the issue of ripeness.

## DISCUSSION

{6} The proper division of power between state and federal governments is a debate that has waged since the founding of this nation. James Madison highlighted the debate in The Federalist Papers, pointing out the potential dangers of a centralized federal government to the states. THE FEDERALIST No. 39, at 256–63 (James Madison) (M. Walter Dunne ed.1901) (adoption of republican principles in the new Constitution), No. 45, at 314–20 (discussion of possible dangers to state governments from the federal government), No. 46, at 321–28 (comparison of the powers of the state and federal government). Ultimately, states ceded their autonomy as part of a balanced, federalist system in which they retained a level of sovereignty, including a corresponding level of sovereign immunity.

{7} The degree of immunity retained by the states today is one outcome of this historical debate over the balance of power between the states and the federal government. *See* ERWIN CHEMERINSKY, FEDERAL JURISDICTION 398–400 (4th ed.2003) (discussing the sovereign immunity debates at the state ratification conventions). Under the Eleventh Amendment,[2] the doctrine of constitutional sovereign immunity historically barred individual claims against a state when brought in federal court. *See Alden v. Maine,* 527 U.S. 706, 730, 119 S.Ct. 2240, 144 L.Ed.2d 636 (1999). Since the United States Supreme

Court's holding in *Alden,* constitutional sovereign immunity may also bar certain individual claims for damages against a state in state court. *See id.* at 728, 119 S.Ct. 2240; *Cockrell v. Bd. of Regents of N.M. State Univ.,* 2002–NMSC–009, ¶¶ 1, 14, 132 N.M. 156, 45 P.3d 876 (state constitutional sovereign immunity bars an individual claim for monetary damages under the Fair Labor Standards Act filed against the state in state court).

{8} As will be further discussed in this opinion, the effect of *Alden,* if any, upon claims filed in state court under the Takings and Contracts Clauses lies at the heart of this controversy. Before analyzing *Alden* in detail, however, we begin our analysis by reviewing the Takings Clause and its history of enabling claims similar to those brought by the Mannings in this case. We will then separately address the Contracts Clause claim.

### Standard of Review

{9} Whether constitutional sovereign immunity can shield a state, in state court, from claims based on the Takings and Contracts Clauses is an issue of law we review *de novo. Hasse Contracting Co. v. KBK Fin., Inc.,* 1999–NMSC–023, ¶ 9, 127 N.M. 316, 980 P.2d 641.

### Takings Clause Claims Against State Governmental Agencies

{10} The Takings Clause is found in the Fifth Amendment to the United States Constitution and prevents the government from taking private property, overtly or through regulation, without justly compensating the lawful owner. U.S. CONST. amend. V ("[P]rivate property [shall not] be taken for public use, without just compensation."); *Pennsylvania Coal Co. v. Mahon,* 260 U.S. 393, 415, 43 S.Ct. 158, 67 L.Ed. 322 (1922) ("while property may be regulated to a certain extent, if regulation goes too far it will be recognized as a taking"). As an essential element of individual liberty, the Takings Clause was included in the Bill of Rights to

---

**2.** "The Judicial power to the United States shall not be construed to extend to any suit in law or equity commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any foreign State." U.S. CONST. amend. XI.

ensure the protection of private property from an overreaching government. *See* D. Benjamin Barros, *The Police Power and the Takings Clause*, 58 U. MIAMI L.REV. 471, 512–13 (2004) (James Madison's intent in drafting the Fifth Amendment was to protect individual property rights in the Constitution based on the belief that such individual rights may not be adequately protected by the political process). The constitutional framers selected just compensation as their specific remedy for enforcement of that right. *See generally Cannon v. State*, 807 A.2d 556, 566–69 (Del.2002) (Holland, J., dissenting) (discussing the early origins of the Takings Clause and the purpose behind its incorporation into the Bill of Rights) (citing JAMES W. ELY, JR., THE GUARDIAN OF EVERY OTHER RIGHT: A CONSTITUTIONAL HISTORY OF PROPERTY RIGHTS (2d ed.1998)).

■ {11} For over a century, the Fifth Amendment has been made applicable to the states through the Fourteenth Amendment's guarantee of due process. *Chicago B. & Q.R. Co. v. City of Chicago*, 166 U.S. 226, 235–42, 17 S.Ct. 581, 41 L.Ed. 979 (1897). In regard to the Takings Clause, the state must provide a "reasonable, certain and adequate provision for obtaining compensation," both when property is physically taken as well as when a regulation greatly reduces the economic viability of the property. *Williamson County Reg'l Planning Comm'n v. Hamilton Bank*, 473 U.S. 172, 194, 105 S.Ct. 3108, 87 L.Ed.2d 126 (1985) (quoted authority omitted).

{12} Historically, the United States Supreme Court has consistently applied the Takings Clause to the states, and in so doing recognized, at least tacitly, the right of a citizen to sue the state under the Takings Clause for just compensation. Three such cases merit discussion.

{13} In *Lucas v. South Carolina Coastal Council*, 505 U.S. 1003, 1027–30, 112 S.Ct. 2886, 120 L.Ed.2d 798 (1992), a landowner brought a takings claim against the state agency responsible for implementing regulations that restricted private development on state beaches to prevent beach erosion. The Supreme Court held that the state could be held accountable to the owner for just compensation if, on remand, the state court found that the development regulations were restrictive enough to amount to a taking of the beachfront property. *Id.* at 1027–28, 112 S.Ct. 2886.

{14} A second case, *Palazzolo v. Rhode Island*, 533 U.S. 606, 614–15, 121 S.Ct. 2448, 150 L.Ed.2d 592 (2001), also involved restrictions on development of beachfront property, this time due to regulations protecting salt marshes and other coastal areas from environmental damage. In remanding the case to examine the takings question, the Supreme Court tacitly assumed, as in *Lucas*, that the landowner could sue the state for just compensation in the event the development regulations were so restrictive that they amounted to a taking. *Palazzolo*, 533 U.S. at 632, 121 S.Ct. 2448.

{15} Most recently, in *Tahoe–Sierra Preservation Council, Inc. v. Tahoe Regional Planning Agency*, 535 U.S. 302, 306–09, 122 S.Ct. 1465, 152 L.Ed.2d 517 (2002), the takings claim was brought against an interstate regional planning agency, created by legislation in both California and Nevada, and comprised of individuals from both states. After the planning agency imposed a moratorium on development around Lake Tahoe to protect its crystalline waters, landowners sued the planning agency alleging a taking and demanding just compensation. *Id.* at 307–14, 122 S.Ct. 1465. Although the Court held that the moratorium did not constitute a taking in this instance, it also set forth the analysis to be applied in temporary taking situations as the one described. *Id.* at 341–42, 122 S.Ct. 1465.

{16} Even though the Supreme Court did not explicitly address the issue of state sovereign immunity, these three cases demonstrate the Court's thinking, and inform our own on that subject, because in each case the possibility of a compensatory claim against the state was at the center of the controversy. And these three recent opinions do not stand alone. Even before *Lucas*, the Supreme Court suggested that the Takings Clause provides a justiciable remedy for individuals to assert against the state in state court.

{17} In *First English Evangelical Lutheran Church of Glendale v. Los Angeles County*, 482 U.S. 304, 316 n. 9, 107 S.Ct. 2378, 96 L.Ed.2d 250 (1987), the Supreme Court suggested that the Fifth Amendment's Takings Clause trumps state sovereignty. *See generally* 1 LAURENCE H. TRIBE, AMERICAN CONSTITUTIONAL LAW § 6–38, at 1272 (3d ed.2000) (suggesting that based on *First English* the Takings Clause "trumps state (as well as federal) sovereign immunity"). The Court made clear that "the compensation remedy is required by the Constitution," and rejected the argument that the Takings Clause could only be enforced by injunctive relief. *First English*, 482 U.S. at 316, 107 S.Ct. 2378.[3]

■ {18} Applying this constitutional framework to the case before us, we acknowledge the close resemblance between the Mannings' situation and the facts in *Lucas, Palazzolo*, and *Tahoe*. Like the property owners in each of these cases, the Mannings are contending with state agencies responsible for implementing legislation intended to protect land from certain uses. In the Mannings' case, the regulations require that owners of existing mines complete an in-depth mining operation site assessment, including certain reclamation requirements. *See* § 69–36–7. These regulations are intended to ensure that mine owners properly reclaim land that has been mined. Section 69–36–2. Looking not to the merits of their takings claim, but to the broader question of whether the Mannings may even assert such a claim in state court, this precedent from the United States Supreme Court strongly suggests that the court below erred in rejecting the Mannings' claim.

{19} Importantly, New Mexico constitutional and statutory law also supports the proposition that sovereign immunity does not bar takings claims when asserted against the state for just compensation, at least in certain situations. Both the constitution and laws of New Mexico include provisions requiring just compensation when the state takes private property for public use. N.M. CONST., art. II, § 20 ("Private property shall not be taken or damaged for public use without just compensation."); NMSA 1978, § 42A–1–29 (1981) (authorizing inverse condemnation proceedings against any government agency of the state that is authorized to exercise eminent domain). Although these legal authorities do not apply directly to the Mannings' case, because this is not an instance of eminent domain, they nonetheless demonstrate that the State provides compensation under similar circumstances, and can be sued in state court if it does not.[4] Sections 42A–1–23, –29; *see also* Seamon, *supra*, at 1118 n. 249 (arguing that New Mexico has waived its immunity from certain just compensation suits through its enactment of these laws).

{20} In response, the State argues a radical position that creates a paradox. The State acknowledges that if a state agency has the power of eminent domain, like the Transportation Department, then the State must provide just compensation for a taking. However, if the agency is not given the power of eminent domain, like the agencies here, but is guilty of a regulatory taking like that alleged by the Mannings, then the private individual is without a remedy in state court, even though both the State and Federal Constitutions obligate the State to pay.

■ {21} We are not suggesting that the legislature cannot prescribe terms and conditions that govern recovery under the Takings Clause, such as Section 42A–1–29. When a statutory framework provides for recovery, individuals must abide by it. However, such legislation cannot insulate the state from providing just compensation for takings that do not involve formal eminent

---

3. In a later case, a plurality of the Supreme Court noted it was not yet decided if sovereign immunity was a bar to Takings Clause claims. *City of Monterey v. Del Monte Dunes*, 526 U.S. 687, 714, 119 S.Ct. 1624, 143 L.Ed.2d 882 (1999) (plurality opinion) (citing *First English*, 482 U.S. at 316, n. 9, 107 S.Ct. 2378). *See generally* Richard H. Seamon, *The Asymmetry of State Sovereign Immunity*, 76 WASH. L.REV. 1067, 1077 (2001) (arguing that the Supreme Court has left the issue open).

4. The Mannings originally attempted to bring their claim under Section 42A–1–29. That claim was dismissed because the State agencies here do not have a statutory grant of eminent domain power. Thus, the claim did not fall under the provisions of Section 42A–1–29.

domain powers, which is the effect of Section 42A–1–29. Holding otherwise would expose more citizens to takings without adequate compensation, contrary to the protections our Constitution provides. When a taking occurs, just compensation is required by the Constitution, regardless of state statute. *See First English*, 482 U.S. at 321, 107 S.Ct. 2378 ("where the government's activities have already worked a taking of all use of property, no subsequent action by the government can relieve it of the duty to provide compensation for the period during which the taking was effective").

{22} If we were to relieve the state from paying for takings when agencies do not have statutory eminent domain authority, then paradoxically we would bar practically every regulatory taking claim against a state agency. A regulatory takings claim, by definition, does not invoke eminent domain powers because the state claims only to regulate the use of land and not to condemn its title. But the protections of the Fifth Amendment do not rest on such formalistic distinctions. A regulatory taking can be just as devastating to property rights as a taking by eminent domain, and the right of the landowner to compensation is just as central to the promise of the Bill of Rights in either instance.

**The State's Argument Under *Alden v. Maine***

{23} In the face of so much authority favoring the Mannings' position, the State agencies base their argument primarily on *Alden*, 527 U.S. 706, 119 S.Ct. 2240, 144 L.Ed.2d 636 (1999), and the shift in federalist principles discussed in that opinion. The critical question for this Court is whether *Alden* even applies. To answer that question, we must resolve what effect, if any, *Alden* has when immunity is asserted against claims for just compensation that are brought directly under the text of the Fifth Amendment, as opposed to claims for damages under statutory rights created by Congress. Accordingly, we turn to an analysis of *Alden* in light of the Mannings' claim.

{24} *Alden* and its progeny stand for the proposition that state constitutional sovereign immunity bars individual claims for damages that are based on legislation passed by Congress pursuant to its Article I powers. *Alden*, 527 U.S. at 754, 119 S.Ct. 2240; *Seminole Tribe of Fla. v. Fla.*, 517 U.S. 44, 59, 116 S.Ct. 1114, 134 L.Ed.2d 252 (1996); *see also Gill v. Pub. Employees Ret. Bd.*, 2004–NMSC–016, 135 N.M. 472, 90 P.3d 491 (discussing the holding in *Alden* while evaluating a claim for injunctive relief asserted against the State under the federal Age Discrimination in Employment Act); *Cockrell*, 2002–NMSC–009, ¶¶ 14–15, 132 N.M. 156, 45 P.3d 876 (holding that sovereign immunity barred a post-*Alden* claim under the Fair Labor Standards Act for money damages asserted against the state in state court). Specifically, the issue in *Alden*, 527 U.S. at 711–13, 119 S.Ct. 2240, was whether an individual's claim for damages against the state, under the Fair Labor Standards Act (FLSA), filed in state court, was barred by sovereign immunity. Congress passed the FLSA under the constitutional authority of the Commerce Clause, which is part of the United States Constitution. U.S. CONST., art. I, § 8, cl. 3 ("The Congress shall have Power To ... regulate Commerce with foreign Nations, and among the several States...."). In *Alden*, 527 U.S. at 754, 119 S.Ct. 2240, the Court held that a private individual cannot sue an unconsenting state in state court for money damages under a law created by Congress pursuant to its Article I powers, such as the FLSA. Critical to the holding, the Court determined that the several states did not cede all of their inherent sovereignty, including immunity from suit, simply by adopting Article I of the Constitution. *Id.* The Court concluded that immunity "is a fundamental aspect of the sovereignty which the States enjoyed before the ratification of the Constitution, and which they retain today." *Id.* at 713, 119 S.Ct. 2240.

{25} Based on *Alden*, this Court in *Cockrell*, 2002–NMSC–009, ¶ 1, 132 N.M. 156, 45 P.3d 876, found that New Mexico's constitutional sovereign immunity shielded the state from private FLSA suits brought in state court. We held that New Mexico did not waive its sovereign immunity in regard to the congressionally created remedies found in the FLSA, as the FLSA was created pursu-

ant to Congress' Article I powers. *Id.* ¶¶ 14–15; *see also Gill,* 2004–NMSC–016, ¶ 49, 135 N.M. 472, 90 P.3d 491 (holding a claim for injunction, but not money damages, against a state officer for a violation of the Age Discrimination in Employment Act, enacted under Article I, Section 8 of the United States Constitution, was not barred by sovereign immunity under the *Ex parte Young* exception).

{26} The question in this case, however, differs from that in *Alden* and *Cockrell.* Here, the question is focused on a form of monetary relief—"just compensation" for a taking—that is not the result of congressional action under Article I. The Mannings' claim does not rely at all on congressional action. Rather, the just compensation claim stems directly from the text of the Constitution through the Fifth and Fourteenth Amendments. *See* U.S. CONST. amend. V ("nor shall private property be taken for public use, without just compensation"). Whereas under Article I Congress is allowed to assert its control over states only to a certain point, rights recognized in the people within the text of the Constitution know no such limitation. And as we shall see, the Court in *Alden* intended no such limitation.

{27} The Court in *Alden,* 527 U.S. at 740, 119 S.Ct. 2240, acknowledged the difference between a claim asserted against a state under a congressional statute as opposed to one derived directly from the Bill of Rights. Although sovereign immunity may shield states from liability under certain Article I obligations created by Congress, the balance of power shifts when "the obligation arises from the Constitution itself." *Id.* (distin-

guishing *Reich v. Collins,* 513 U.S. 106, 115 S.Ct. 547, 130 L.Ed.2d 454 (1994), from the facts presented in *Alden* ); *see also Cent. Virginia Cmty. Coll. v. Katz,* 546 U.S. 356, ——, 126 S.Ct. 990, 1004, 163 L.Ed.2d 945 (2006) (holding that state sovereign immunity did not bar a claim based on bankruptcy proceedings under Article I, Section 8, Clause 4 because "States agreed in the plan of the Convention" to be subject to such suits).[5] The Court in *Alden,* 527 U.S. at 713, 119 S.Ct. 2240, found that while state constitutional sovereignty is a right the states "retain today," that right can be "altered by the plan of the Convention or certain constitutional Amendments."

{28} *Alden,* therefore, lends encouragement to the concept before us now that a right and a remedy textually rooted in the Constitution supersedes or "trumps" state constitutional sovereign immunity, although Congressional remedies fashioned under the Commerce Clause powers of Article I, Section 8 do not. *Alden,* 527 U.S. at 740, 119 S.Ct. 2240; see *also Boise Cascade Corp. v. State ex rel. Or. State Bd. of Forestry,* 164 Or.App. 114, 991 P.2d 563, 568 (1999) ("[T]he [Supreme] Court, in its recent Eleventh Amendment decisions, did not intend to abandon the notion that at least some constitutional claims are actionable against a state ... due to the nature of the constitutional provision involved."). Where failure to provide a remedy is unconstitutional, then under the Fourteenth Amendment's due process guarantee, the State must provide "the remedy it has promised." *Alden,* 527 U.S. at 740, 119 S.Ct. 2240. In the Mannings' case, the state has failed to provide the remedy of just

---

5. The opinion in *Katz* is instructive because it discusses *Alden's* limitations. In *Katz* the Court was examining whether sovereign immunity barred actions against the state under the Bankruptcy Clause. 126 S.Ct. at 1004. The Bankruptcy Clause is connected to the Commerce Clause which was at issue in *Alden. Katz,* 126 S.Ct. at 1000 n. 9. The Court held that based on the Bankruptcy Clause's history, including discussion of it at the Constitutional Convention, along with the limited jurisdiction of the bankruptcy court, the state cannot assert a sovereign immunity defense. *Id.* at 1004–05. The case is distinguishable in that Congress enacted laws under the Bankruptcy Clause, which is not the case here. However, the majority opinion made

clear that the question it was addressing was not "whether Congress has abrogated States' immunity," but rather if Congress' decision to subject states to such laws was within its power under the Bankruptcy Clause. *Id.* at 1005. Thus, no explicit waiver of sovereign immunity by Congress was needed because the clause demonstrated that the States consented to suit. *Id.* Justices Thomas, Scalia, Roberts and Kennedy dissented arguing that under *Alden,* and other prior case-law, it is clear that no Congressional action under Article I can waive sovereign immunity and flat out disagreed that the Bankruptcy Clause itself could have waived sovereign immunity. *Id.* at 1006–08 (Thomas, J., dissenting).

compensation, "the remedy it has promised" under both the Fifth and Fourteenth Amendments.

{29} In its discussion of *Reich v. Collins,* 513 U.S. 106, 115 S.Ct. 547, 130 L.Ed.2d 454 (1994), the *Alden* opinion emphasizes the point, central to our case, that failure to provide a promised remedy in the state courts may lead to a violation of due process. 527 U.S. at 740, 119 S.Ct. 2240. In *Reich,* 513 U.S. at 108–09, 115 S.Ct. 547, the petitioner brought suit against the State of Georgia seeking recovery of state income taxes unconstitutionally imposed. Conceding the illegality of the tax, the state nonetheless construed its refund statute not to allow the claim in state trial court and dismissed the action. *Id.* at 109, 115 S.Ct. 547. In a unanimous opinion, the Supreme Court held that the lack of any refund provision denied due process, because the taxes were imposed and paid, in part, on the understanding that illegal taxes would be refunded; that, in the Court's words, taxpayers "pay first, litigate later." *Id.* " '[A] denial by a state court of a recovery of taxes exacted in violation of the laws or Constitution of the United States by compulsion is itself in contravention of the Fourteenth Amendment,' the sovereign immunity States traditionally enjoy in their own courts notwithstanding." *Id.* at 109–10, 115 S.Ct. 547 (citation omitted). *See generally* Seamon, *supra,* at 1110–15 (arguing that the Supreme Court's state taxation cases demonstrate that the procedural due process requirements of the Fourteenth Amendment require a state to provide a post-deprivation procedure that is clear and certain and that can result in an award of money from the state treasury).

{30} Analyzing *Reich,* the Court in *Alden* stated:

> [W]e held [in *Reich* ] that, despite its immunity from suit in federal court, a State which holds out what plainly appears to be "a clear and certain" postdeprivation remedy for taxes collected in violation of federal law may not declare, after disputed taxes have been paid in reliance on this remedy, that the remedy does not in fact exist. .... In this context, due process requires the State to provide the remedy it has

promised. The obligation arises from the Constitution itself; *Reich* does not speak to the power of Congress to subject States to suits in their own courts.

*Alden,* 527 U.S. at 740, 119 S.Ct. 2240 (citations omitted).

{31} The parallel to the Mannings' case is striking. As in *Reich,* the State agencies have allegedly taken property but without providing a promised "postdeprivation remedy," in this case the remedy of "just compensation" promised in the Fifth Amendment which "arises from the Constitution itself." *See id.* As in *Reich,* 513 U.S. at 110, 115 S.Ct. 547, "the sovereign immunity States traditionally enjoy in their own courts notwithstanding," the State agencies must provide that remedy or risk violating the due process clause. The only remedy for an erroneous tax collection is returning the tax. The only remedy for a taking of private property is just compensation, exactly as promised in the Constitution.

{32} The holding in *Alden* did nothing to alter this outcome, and in fact signaled its acceptance of that same result. We hold, therefore, that *Alden* did not alter the historical practice of applying the Takings Clause to the states, and nothing in that opinion permits a state to bar a claim for "just compensation" from its courts.

**Other Jurisdictions**

{33} Importantly, no other jurisdiction post-*Alden,* federal or state, has held that Takings Clause claims are barred by state constitutional sovereign immunity. In addressing a takings claim against the State of Kentucky in federal court, the Sixth Circuit noted that, notwithstanding constitutional sovereign immunity, the "Fifth Amendment's requirement of just compensation forces the states to provide a judicial remedy in their *own* courts." *DLX, Inc. v. Kentucky,* 381 F.3d 511, 527 (6th Cir.2004). The Sixth Circuit specifically noted that *Alden* did not bar just compensation claims as asserted against the States. *Id.* at 528 (arguing that *Alden* only dealt with remedies created by Congress under Article I and that the just compensation remedy was different because it is required by the Constitution itself). The

court found that the Eleventh Amendment barred the claim in federal court, but if brought in state court, the court would have been required to hear it. *Id. But see Azul–Pacifico, Inc. v. City of Los Angeles,* 973 F.2d 704, 705 (9th Cir.1992) (takings claim against the city based directly on the Constitution was barred because 42 U.S.C. § 1983 could be utilized instead), *cert. denied,* 506 U.S. 1081, 113 S.Ct. 1049, 122 L.Ed.2d 357 (1993).

{34} The South Dakota Supreme Court and the Oregon Court of Appeals also examined the same question that we address here. *See Benson v. State,* 710 N.W.2d 131 (S.D. 2006); *Boise Cascade,* 164 Or.App. 114, 991 P.2d 563; *SDDS, Inc. v. State,* 650 N.W.2d 1, 9 (S.D.2002). Both held that sovereign immunity does not bar just compensation claims brought against the state in state court, even after the *Alden* decision. *See also First Union Nat. Bank v. Hi Ho Mall Shopping Ventures, Inc.,* 273 Conn. 287, 869 A.2d 1193, 1197–98 (2005) (holding a foreclosure claim on a municipal tax lien asserted against the state was barred by sovereign immunity, but sovereign immunity would not bar the bank from seeking "just compensation for the state's taking of its property as a result of the allegedly unpaid taxes" under the Takings Clause as applied to the states under the Fourteenth Amendment).

{35} In *Boise Cascade,* 991 P.2d at 565, a state agency prohibited logging on a portion of a landowner's property because an endangered species was nesting in the location. The landowner claimed that not being allowed to log the site, which was purchased specifically for that purpose, constituted a taking under both the United States and Oregon Constitutions. *Id.* The Oregon court held that the United States Supreme Court, based on its statements in *First English* and its discussion of *Reich* in *Alden,* "did not intend to abandon the notion that at least some constitutional claims are actionable against a state, even without a waiver or congressional abrogation of sovereign immunity, due to the nature of the constitutional provision involved." *Boise Cascade,* 991 P.2d at 568.

{36} Three years later, relying in large part on the reasoning in *Boise Cascade,* the South Dakota Supreme Court similarly held that sovereign immunity did not bar a just compensation claim against the state in state court based on a regulatory taking similar to the Mannings' claim here. *See SDDS,* 650 N.W.2d at 9 ("[T]he holdings in the *Alden* trilogy apply only to congressional attempts to abrogate a state's sovereign immunity through Article I legislation. The *Alden* trilogy does not suggest that Fifth Amendment takings claims that originate from the Constitution itself are barred by the Eleventh Amendment.").

{37} *Boise Cascade, DLX,* and *SDDS* inform this case. Just as in *Boise Cascade,* the actions of the State agencies here impose environmental regulations which arguably have the effect of taking the Mannings' property, for which they may be entitled to compensation. All three of these opinions support the Mannings' claim that the Takings Clause creates a cause of action against a state which is actionable in state court and to which the state may not assert immunity. Most importantly, these cases support the conclusion that *Alden* did nothing to alter this outcome.

**Self–Executing Nature of the Takings Clause**

{38} The State agencies offer still another argument. They argue that the Fifth Amendment is not self-executing, and creates no claim for compensation without further congressional action.

{39} In examining specifically whether the Takings Clause is self-executing, we note that there are currently two views on the subject. One view agrees with the State agencies that the Takings Clause is not self-executing and that congressional action is required to enforce the rights protected in the Takings Clause. The other view is that congressional action is not necessary to enforce the attendant rights in state courts, because the Takings Clause is self-executing and creates both a right and remedy. *See Manning,* 2004–NMCA–052, ¶ 11, 135 N.M. 487, 90 P.3d 506 (citing Robert Brauneis, *The First Constitutional Tort: The Remedial*

*Revolution in Nineteenth–Century State Just Compensation Law,* 52 VAND. L.REV. 57, 138 n. 344 (1999)).

{40} The State agencies assert that the first view is correct and as support they cite to the Tucker Act. The Tucker Act, 28 U.S.C. § 1491(a)(1), was passed in 1887 to give the federal court of claims jurisdiction over a wide variety of claims against the United States government, including claims for compensation.[6] *See Lion Raisins, Inc. v. United States,* 57 Fed.Cl. 435, 437–38 (2003). Prior to its passage, owners who had property taken by the federal government had to petition Congress for compensation, or had to prove they had a contract claim against the United States. *Id.* at 438. Because the federal courts lacked jurisdiction over such claims before the Tucker Act, many were left with a right to compensation but no court in which to enforce that right. *Id.* at 437–38.

{41} The State asserts that the Tucker Act provides support for the assertion that the Fifth Amendment by itself never abrogated sovereign immunity. Under this theory, the State argues the Tucker Act both provides jurisdiction and waives sovereign immunity for Takings Clause claims against the federal government. Accordingly such a statutory waiver of immunity must be obtained before takings claims can be brought against the states. *See, e.g., Soriano v. United States,* 352 U.S. 270, 273, 77 S.Ct. 269, 1 L.Ed.2d 306 (1957) ("the Congress in the Act creating the Court of Claims gave the Government's consent to be sued therein only in certain classes of claims"); *Lion Raisins,* 57 Fed.Cl. at 437–38.

{42} The Mannings, on the other hand, assert that Congress never gave "permission" for the government to be sued under the Fifth Amendment, but rather the Tucker Act was only necessary to create federal jurisdiction over takings claims against the federal government. The Fifth Amendment itself created a remedy for unconstitutional takings that superseded governmental immunity. *See, e.g., Hair v. United States,* 350 F.3d 1253, 1257 (Fed.Cir.2003) ("It is true that sovereign immunity does not protect the government from a Fifth Amendment Takings claim because the constitutional mandate is 'self-executing.'" (citing *United States v. Clarke,* 445 U.S. 253, 257, 100 S.Ct. 1127, 63 L.Ed.2d 373 (1980)); *Preseault v. Interstate Commerce Comm'n,* 494 U.S. 1, 12, 110 S.Ct. 914, 108 L.Ed.2d 1 (1990) takings claims are "founded on the Constitution" but the jurisdiction of the Court of Claims is based on the Tucker Act (quoting *United States v. Causby,* 328 U.S. 256, 267, 66 S.Ct. 1062, 90 L.Ed. 1206 (1946); *Jacobs v. United States,* 290 U.S. 13, 16, 54 S.Ct. 26, 78 L.Ed. 142 (1933) (takings claims are "founded upon the Constitution"). The Tucker Act is a complex jurisdictional statute that provides the federal courts, courts of limited jurisdiction, with the ability to hear several specific types of claims against the federal government, including those founded upon the Constitution. *See supra* note 6; U.S. CONST. art. III, § 2 (outlining the jurisdiction of the federal courts).

{43} On its face, the Tucker Act only applies to federal takings claims filed against the federal government. No court has applied the Tucker Act to the States. *See Benson,* 710 N.W.2d 131; *Boise Cascade,* 164 Or.App. 114, 991 P.2d 563; *SDDS,* 650 N.W.2d 1; *First Union Nat. Bank,* 273 Conn. 287, 869 A.2d 1193. No court has applied the State's argument to state court proceedings, that because the Tucker Act was necessary to waive federal sovereign immunity for federal compensation claims, or so it is argued, then congressional action is nec-

---

**6.** The Tucker Act states in pertinent part,

> The United States Court of Federal Claims shall have jurisdiction to render judgment upon any claim against the United States founded either upon the Constitution, or any Act of Congress, or any regulation of an executive department, or upon any express or implied contract with the United States, or for liquidated or unliquidated damages in cases not sounding in tort.

28 U.S.C. § 1491. Early precedent found that Takings Clause claims fell under the Tucker Act only if the claim could be classified as an "implied contract." Seamon, *supra,* at 1092 (quoted authority omitted). However, the Supreme Court later found that the clause itself creates a cause of action founded upon the Constitution, thus that section of the Tucker Act could be utilized rather than the implied contract section to obtain federal court jurisdiction. *Id.* at 1092–93.

essary to abrogate state sovereign immunity for state compensation claims. We do not agree with the State's assertion that there must be a specific waiver of immunity before the state can be sued for "just compensation" under the Takings Clause. In our view, the Fifth Amendment is "self-executing." Requiring further governmental action when it is the government that has effected the taking is contrary to the very reason for the Fifth Amendment: a check against abusive governmental power. If we were to accept the State's argument, New Mexico would be the first and only jurisdiction in the nation to apply this Tucker Act analysis to state court proceedings. We decline to do so.

{44} The State agencies do not rest with the previous argument. They further contend that the Takings Clause is not self-executing as applied to the states because it is applied through Section 1 of the Fourteenth Amendment, and only Section 5 of the Fourteenth Amendment can abrogate sovereign immunity. *See Seminole Tribe of Fla.*, 517 U.S. at 59, 116 S.Ct. 1114 (holding Section 1 of the Fourteenth Amendment includes prohibitions on traditional state power). Section 1 says, "nor shall any State deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws." U.S. CONST. amend. XIV. Section 5 says, "[t]he Congress shall have power to enforce, by appropriate legislation, the provisions of this article." *Id.* The just compensation provision of the Takings Clause is made applicable to the states through the Fourteenth Amendment. *Chicago B. & Q.R. Co.*, 166 U.S. at 235–42, 17 S.Ct. 581. The Fourteenth Amendment's effect, at least in part, is to apply most of the first ten Amendments to the States. *See Adamson v. California*, 332 U.S. 46, 71–72, 67 S.Ct. 1672, 91 L.Ed. 1903 (1947), *overruled in part on other grounds by Malloy v. Hogan*, 378 U.S. 1, 84 S.Ct. 1489, 12 L.Ed.2d 653 (1964). Thus, the State agencies return to their point, discussed above, that Congressional action is necessary to enforce the Takings Clause against the states.

■ {45} We do not find the argument persuasive. It is Section 1 of the Fourteenth Amendment in conjunction with the "just compensation" remedy found in the Takings Clause that abrogates state sovereign immunity. Section 5 gives Congress the power to create remedies, if Congress decides any are necessary, to enforce the rights found in the Fourteenth Amendment, including those found in Section 1. An example of such legislation, protecting against the denial of due process is Title II of the Americans with Disabilities Act. 42 U.S.C. § 12101; *see also Tennessee v. Lane*, 541 U.S. 509, 533–34, 124 S.Ct. 1978, 158 L.Ed.2d 820 (2004) (holding that Title II of the ADA was a valid use of Congress' power under Section 5 of the Fourteenth Amendment). The ADA provides the remedy under Section 5 to be applied when a state violates the Fourteenth Amendment by depriving an individual of due process and equal protection as found in Section 1. Congressional action is necessary under Section 5 because the Constitution does not contain a specific remedy for the rights it has created under Section 1: due process and equal protection. However, the Takings Clause is different; it does have its own remedy within the text of the Fifth Amendment: just compensation.

■ {46} The Framers of the Constitution explicitly referred to remedies only twice in the Constitution, one being the just compensation provision of the Takings Clause. *See* RICHARD H. FALLON, JR., DANIEL J. MELTZER & DAVID L. SHAPIRO, HART AND WECHSLER'S THE FEDERAL COURTS AND THE FEDERAL SYSTEM 796–97 (5th ed.2003) (stating that the second mention of a remedy is that of habeas corpus which is protected from interference by Congress). The Takings Clause creates an individual right to the remedy of just compensation. More specifically, as incorporated through the Fourteenth Amendment, the Takings Clause mandates that states have made, at the time of the taking, "reasonable, certain and adequate provision for obtaining compensation." *Williamson County Reg'l Planning Comm'n*, 473 U.S. at 194, 105 S.Ct. 3108 (citations and internal quotation marks omitted). *See generally* Seamon, *supra*, at 1108 (stating that a taking without a procedure for obtaining compensation violates the due process right found in Section 1

of the Fourteenth Amendment (citing *Reich,* 513 U.S. at 109, 115 S.Ct. 547)). This is the remedy intended by the Framers of the Constitution, and the remedy thereafter applied to the states through Section 1 of the Fourteenth Amendment.

■ {47} These factors lead us to conclude that the Takings Clause is self-executing, at least as applied to the states through the Fourteenth Amendment. We have found no judicial opinion specifically holding that it is not self-executing, and no case has held that to apply the Takings Clause to the states requires congressional action under Section 5 of the Fourteenth Amendment. The dearth of precedent used to support the State agencies' position speaks in favor of a contrary view. *See, e.g., Alden,* 527 U.S. 706, 119 S.Ct. 2240.

### The Contracts Clause Claim

■ {48} The Mannings also seek compensatory damages for a violation of the Contracts Clause of the United States Constitution, asserting that their future and current contractual obligations are impaired by the Mining Act. The Contracts Clause says, "[n]o State shall ... pass any ... Law impairing the Obligation of Contracts." U.S. CONST. art. I, § 10. The State agencies again claim that state constitutional sovereign immunity bars the Mannings' claim.

{49} The Supreme Court in *Alden* discussed the Contracts Clause and sovereign immunity as related to its opinion in *Hans v. Louisiana,* 134 U.S. 1, 10 S.Ct. 504, 33 L.Ed. 842 (1890). In *Hans,* 134 U.S. at 10, 10 S.Ct. 504, the Supreme Court held that Louisiana was immune from suit in federal court based on a claim for money damages under the Contracts Clause. While we note that the holding in *Hans* is highly disputed, it has not yet been overturned. *See Seminole Tribe of Fla.,* 517 U.S. at 86, 116 S.Ct. 1114 (Stevens,

J., dissenting) (arguing that *Hans* "served only to establish a presumption against jurisdiction that Congress must overcome, not an inviolable jurisdictional restriction that inheres in the Constitution itself"); *Welch v. Tex. Dep't of Highways & Pub. Transp.,* 483 U.S. 468, 477–93, 107 S.Ct. 2941, 97 L.Ed.2d 389 (1987) (rejecting the urging of Justices Brennan, Marshall, Blackmun and Stevens to overrule *Hans* ). The Supreme Court in *Alden* revived the holding in *Hans,* referring to it as a case in which it had "sustained [a state's] immunity in a private suit arising under the *Constitution* itself." *Alden,* 527 U.S. at 732, 119 S.Ct. 2240 (citing *Hans,* 134 U.S. 1, 10 S.Ct. 504).

{50} The Supreme Court's interpretation of *Hans* in *Alden* makes clear that the Mannings' Contracts Clause claim is barred by sovereign immunity because the Contracts Clause does not provide for claims for money damages. We have found no authority to the contrary.[7] In that respect, the Contracts Clause differs from the Takings Clause because only the latter contains its own remedy enforceable upon all those who take property without just compensation.

### CONCLUSION

{51} For the foregoing reasons, we reverse the Court of Appeals regarding the Takings Clause claim and affirm regarding the Contracts Clause claim. We remand this case to the Court of Appeals to address ripeness issues.

{52} **IT IS SO ORDERED.**

WE CONCUR: PATRICIO M. SERNA and EDWARD L. CHÁVEZ, Justices.

PAMELA B. MINZNER and PETRA JIMENEZ MAES, Justices (dissenting).

---

7. The cases cited in the Mannings' brief allow Contracts Clause actions to be asserted against the respective states, but neither claim is for individual money damages for impairment of private contracts. *Renaud v. Wyoming Department of Family Services,* 203 F.3d 723, 725–28 (10th Cir.2000), did not involve an independent claim for money damages based on the Contracts Clause alone, but rather a breach of contract action. *Energy Reserves Group v. Kansas Power & Light Co.,* 459 U.S. 400, 408, 103 S.Ct. 697, 74 L.Ed.2d 569 (1983), was a request for declaratory judgment based on the Contracts Clause, not a request for money damages. Sovereign immunity did not bar these claims because neither sought money damages from the state directly under the Constitution, as was the situation in *Hans.*

**540**

MINZNER, Justice (dissenting).

{53} I respectfully dissent. The majority, in taking up this constitutional question, has followed the Court of Appeals away from a clear path for resolution of this dispute and into what appears to be a thicket of constitutional jurisprudence. I prefer to stay on a safer path and leave the task of cutting through the mass of federalism, takings, and sovereign immunity holdings for another day, and another court. I would simply hold, as the district court did, that this case is not yet ripe.

{54} "Ripeness doctrine is rooted in the same general policies of justiciability as standing and mootness." 13A CHARLES A. WRIGHT, ARTHUR R. MILLER, & EDWARD H. COOPER, FEDERAL PRACTICE AND PROCEDURE § 3532.1, 130 (2d ed.1984). Lack of ripeness, like lack of standing, is a potential jurisdictional defect, which " 'may not be waived and may be raised at any stage of the proceedings, even sua sponte by the appellate court.' " *Gunaji v. Macias*, 2001–NMSC–028, ¶ 20, 130 N.M. 734, 31 P.3d 1008 (quoting *Alvarez v. State Taxation & Revenue Dep't*, 1999–NMCA–006, ¶ 6, 126 N.M. 490, 971 P.2d 1280). As a jurisdictional matter, ripeness must be addressed prior to any consideration of the merits of the case.

> As compared to standing, ripeness assumes that an asserted injury is sufficient to support standing, but asks whether the injury is too contingent or remote to support present adjudication.... Ripeness cases have generated a functional approach that directly weighs the importance of the interest advanced; the extent of the injury or risk; the difficulty of deciding the substantive issues and the allied need for specific factual illumination; and the sensitivity of the issues in relation to future cases, the states, and other branches of the federal government.

WRIGHT, MILLER, & COOPER, *supra*, at 130. "The values of avoiding unnecessary constitutional determinations and establishing proper relationships between the judiciary and other branches of the ... government lie at the core of ripeness policies." *Id.* at 120; *see also Gunaji*, 2001–NMSC–028, ¶ 20, 130 N.M. 734, 31 P.3d 1008 (" 'constitutional rights should not be litigated unnecessarily' " (quoting *Lewis v. Iowa Dist. Ct.*, 555 N.W.2d 216, 219 (Iowa 1996))). " 'The basic purpose of ripeness law is and always has been to conserve judicial machinery for problems which are real and present or imminent, not to squander it on abstract or hypothetical or remote problems.' " *N.M. Indus. Energy Consumers v. N.M. Pub. Serv. Comm'n*, 111 N.M. 622, 629–30, 808 P.2d 592, 599–600 (1991) (quoting 4 K. DAVIS, ADMINISTRATIVE LAW TREATISE §§ 25.1 (2d ed.1983)); *see also City of Las Cruces v. El Paso Elec. Co.*, 1998–NMSC–006, ¶ 18, 124 N.M. 640, 954 P.2d 72 ("We avoid rendering advisory opinions.").

{55} The district court held that the Mannings' mining operations were subject to a federal injunction stemming from separate federal litigation, *see Manning v. United States*, 146 F.3d 808 (10th Cir.1998), and that mining operations could not resume until federal requirements were met. The Mannings argued on appeal that the federal injunction could not be used to defeat ripeness because one element of compliance with the federal law was compliance with applicable state regulations. In this situation, they argued, their claim might never be considered because the state regulations would not be subject to review. The federal injunction indicates that the Mannings must file an operating plan with the Forest Service, including a plan for reclamation of operations and a bond to cover clean-up costs of mining and milling on public lands. No such plan or bond was filed with the Forest Service. Thus, New Mexico laws and regulations were not the only obstacles to the Mannings' mining operations; even in the absence of any New Mexico regulation, mining operations would be limited by federal law. In addition, it appears that the Mannings have not received a final decision from the relevant state agencies, and in fact withdrew their permit applications prior to commencement of this suit. The Mannings' argument, that the permitting process was unreasonably delayed, is not borne out by the record. Even if it were, it would not be a sufficient basis for a takings claim. *See Tahoe–Sierra Pres. Council, Inc. v. Tahoe Reg'l Planning Agency*, 535 U.S.

302, 334–335, 122 S.Ct. 1465, 152 L.Ed.2d 517 (2002) (rejecting "the extreme categorical rule" that normal delays in obtaining permits could constitute a taking because such a rule would "undoubtedly require changes in numerous practices that have long been considered permissible exercises of the police power"); *see also id.* at 337 nn. 31–32, 122 S.Ct. 1465 (recognizing that permitting delays are similar to temporary moratoria and further noting that even a total moratorium on new development for a limited time period is not a taking). I conclude the case is not ripe for decision. Under these circumstances, any ruling by this Court would be both speculative and advisory.

{56} Although this Court has the power to grant standing in exceptional cases presenting a matter of great public importance, and may waive objections for mootness when an issue is capable of repetition yet may avoid review, *Gunaji*, 2001–NMSC–028, ¶ 10, 130 N.M. 734, 31 P.3d 1008, I am not persuaded it is appropriate to waive the issue of ripeness in this appeal. As explained above, the ripeness doctrine serves important judicial interests: protecting the court from issuing advisory opinions by requiring a present controversy between the parties, ensuring that facts are sufficiently developed for decision, avoiding intrusion on the powers of other branches of government and reserving judicial resources for present, rather than hypothetical questions. This case presents a question which may arise in the future, but can be resolved or reviewed at that time and is unlikely to evade such review. In light of the Court's strong interest in avoiding unripe cases, I conclude that this case does not warrant any exception to our general rules, limiting our jurisdiction to ripe cases.

{57} A decision on ripeness grounds would have the effect of vacating the Court of Appeals decision and I believe it is not necessary to remand the case for further proceedings. *See* WRIGHT, MILLER, & COOPER, *supra,* at § 3532.2, 137 n. 42 and accompanying text. I would therefore affirm the district court's dismissal on ripeness grounds.

I CONCUR: PETRA JIMENEZ MAES, Justice.